United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 31, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

)))))))))))))))))))))))))

No. 04-30598 c/w 05-30074

)))))))))))))))))))))))))

In The Matter Of: WHITAKER CONSTRUCTION COMPANY, INC.

Debtor

- - - - - - - - - - - - - - - - - -

FIDELITY & DEPOSIT COMPANY OF MARYLAND,

Appellee,

v.

FITZGERALD CONTRACTORS, INC.,

Appellant.

_____

In The Matter Of: WHITAKER CONSTRUCTION COMPANY, INC.

Debtor

- - - - - - - - - - - - - - - - - - - -

FIDELITY & DEPOSIT COMPANY OF MARYLAND,

Appellant,

v.

FITZGERALD CONTRACTORS, INC.,

Appellee.

Appeals from the United States District Court
for the Western District of Louisiana

Before GARWOOD, PRADO and OWEN, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

This appeal is the consolidation of two actions, both of which involve FitzGerald Contractors, Inc. ("FitzGerald"), a subcontractor, seeking compensation under Louisiana's Private Works Act, LA. REV. STAT. ANN. §§ 9:4801-55 (West 1991 & Supp. 2005) ("PWA"), from Fidelity & Deposit Company of Maryland, Inc. ("F&D"), a surety, for work performed on construction projects in Louisiana. F&D seeks to avoid liability by asserting the defense of peremption under subsection 9:4813(E) of the PWA. Two questions are presented on appeal: (1) whether FitzGerald's filing of an involuntary bankruptcy petition against the general contractor constituted an "assert[ion of] claims or rights" under subsection 9:4813(E); and (2) whether the peremption period defined in section 9:4822 is triggered when notice of the construction contract is filed but notice of termination is not. Answering both questions in the negative, the district court found for F&D in the Biomedical Project matter and FitzGerald in the Lifeshare Project matter. For the reasons below, we AFFIRM.

I. Background

Whitaker Construction Company, Inc. ("Whitaker"), as contractor, entered into a standard-form construction contract with the Biomedical Research Foundation of Northern Louisiana, as owner, to build a biotechnology manufacturing facility in

2

Shreveport, Louisiana ("Biomedical Project"). The contract was entered into the Caddo Parish, Louisiana mortgage books on April 28, 2000. It required Whitaker to furnish surety bonds guaranteeing payment to subcontractors. F&D, as surety, issued bonds with a penal sum of $9,755,904.00 on April 25, 2000.

Whitaker, as contractor, also entered into a contract with Blood Center Properties, Inc., as owner, to build a facility for Lifeshare Blood Centers in Shreveport, Louisiana ("Lifeshare Project"). This contract was entered into the Caddo Parish mortgage books on July 27, 2000. It also required Whitaker to furnish a surety bond. F&D, again as surety, issued a bond in the amount of $3,541,953.00 on July 26, 2000. For both the Biomedical and Lifeshare projects, the contracts were recorded and the bonds issued pursuant to the PWA.

Effective August 24, 2000, Whitaker and FitzGerald executed two subcontracts, one relating to the Biomedical Project and one to the Lifeshare Project, in each of which FitzGerald agreed to perform work on the facility.

For the Biomedical Project, a Certificate of Substantial Completion was recorded on September 17, 2001 in the mortgage records for Caddo Parrish. For the Lifeshare Project, no official filing was made regarding completion, though other events occurred that suggest the project was completed: on June 29, 2001, the Estopinal Group, architect for the project, compiled a punchlist; minutes of the Lifeshare Project progress

3

meetings indicate the facility was ready to be occupied between July 23 and 26; and, on July 25, the City of Shreveport issued a certificate of occupancy.

II. Procedural History

On August 9, 2002, FitzGerald and two other creditors filed an involuntary bankruptcy petition against Whitaker in bankruptcy court in the Western District of Louisiana. The standard Form B5 filing had the following information: (1) Whitaker's identity as debtor; (2) the nature of Whitaker's business as general contractor; (3) the amount FitzGerald was owed, $586,258.17, including liened amounts of $418,596.58 and un-liened amounts of $167,661.59; (4) that the petition was being filed under Chapter 7 of the Bankruptcy Code; and (5) an assertion of petitioners' eligibility to file under 11 U.S.C. § 303(b). It did not invoke the PWA nor mention specifically amounts owed under it.[1]

On August 19, 2002, F&D filed a notice of appearance in the Whitaker bankruptcy proceeding. On September 6, Whitaker filed an answer to the involuntary petition and a Motion to Convert Case to Chapter 11 Proceeding with a corresponding memorandum in support. On September 12, the bankruptcy court granted the Order of Relief for the involuntary petition and converted the matter to a voluntary Chapter 11 case. On January 9, 2003, FitzGerald

---

[1] The parties do not dispute that the amounts in the filing included the $82,473.89 owed for work on the Biomedical Project and the $81,689.00 owed for work on the Lifeshare Project.

4

filed its proof of claim for all of its claims, liened and un-liended, in the Chapter 11 bankruptcy proceeding.

Regarding the Biomedical Project, FitzGerald filed an adversary complaint in the bankruptcy court on April 16, 2003, naming F&D as defendant. In its complaint, FitzGerald alleged that F&D was liable as surety for payment of $82,473.89 plus interest for amounts Whitaker failed to pay FitzGerald for work it completed on the Biomedical Project. On May 16, F&D answered the complaint, denying FitzGerald's allegations and asserting the defense of peremption. On June 19, F&D moved for summary judgment; FitzGerald made a cross-motion for summary judgment or, alternatively, partial summary judgment. After hearing argument, the bankruptcy court granted FitzGerald's motion for summary judgment in part, and denied F&D's motion. It determined that the involuntary bankruptcy petition was a timely assertion of rights withing the meaning of § 9:4813(E) and that the bankruptcy filing did not stay FitzGerald's rights under the PWA. The bankruptcy court entered judgment on September 2.

F&D appealed to the district court on September 3, 2003. The district court determined that the involuntary bankruptcy petition was not an assertion of rights for purposes of subsection 9:4813(E). It reversed the bankruptcy court's judgment with respect to this issue and affirmed its judgment with respect to finding that the bankruptcy filing did not stay FitzGerald's rights. The district court issued its final

5

judgment on May 26, 2004.  FitzGerald appealed on June 17, 2004, challenging the district court's determination regarding the involuntary bankruptcy petition in the Biomedical matter.

Regarding the Lifeshare Project, FitzGerald filed an adversary complaint in the bankruptcy court on July 16, 2003, naming F&D as defendant.  In it, FitzGerald alleged that F&D was liable as surety for payment of $81,689.00 plus interest for amounts Whitaker failed to pay FitzGerald for work it completed on the Lifeshare Project.  On August 6, F&D answered the complaint, denying FitzGerald's allegations and asserting the defense of peremption.  On October 2, FitzGerald moved for summary judgment or, alternatively, partial summary judgment.  On January 9, 2004, F&D filed a cross-motion for summary judgment. After hearing argument, the bankruptcy court granted FitzGerald's motion for summary judgment in part, and denied F&D's motion.  As in the Biomedical matter, it determined that the involuntary bankruptcy petition was a timely assertion of rights within the meaning of the PWA.  The bankruptcy court also held that, because no certificate of substantial completion was filed for the Lifeshare Project, subsection 9:4822(C) applied, establishing a peremption period of one year and sixty days.  The bankruptcy court entered judgment on March 26.

F&D appealed to the district court, the same court as in the Biomedical matter, on March 29, 2003.  The district court affirmed the bankruptcy court's result, but on different grounds.

6

Because notice of the contract had been filed for the Lifeshare Project but notice of termination had not, the district court held that subsection 9:4822(A) applied and that the peremption period had not yet begun to run. It found that FitzGerald's July 2003 filing of the adversary proceeding was a timely assertion of its rights under the PWA. The district court issued its final judgment on December 10. F&D appealed the Lifeshare matter on December 27, 2004.

Both the Biomedical and the Lifeshare matters are consolidated on appeal.

III. Standard of Review

We review the district court's decisions by the same standards it applied to the decisions of the bankruptcy court. *Kennard v. MBank Waco, N.A.* (*Matter of Kennard*), 970 F.2d 1455, 1457 (5th Cir. 1992); *In re Sinclair*, 417 F.3d 527, 529 (5th Cir. 2005). For questions of law, the standard is *de novo*. *Id*. at 1458.

IV. Discussion

A. The Private Works Act

Both questions before us require interpretation of the Private Works Act, which regulates the rights and responsibilities of persons involved in the construction and improvement of immovables. *See* LA. REV. STAT. ANN. §§ 94801-55, Exposé des Motifs (West 1991). The PWA protects contractors,

7

laborers, suppliers of material and others who contribute to construction projects by granting them a privilege on the immovable to secure the price of their work and obligating owners who use a general contractor to require that contractor to record his contract and secure a surety bond guaranteeing payment to contributors. *Id*. An owner who fails to comply may be personally liable, even to those with whom he is not in contractual privity; and a general contractor who fails to comply may lose his privilege in the immovable. *Id*.

The rights created by the PWA extinguish after a period of time, the length of which is defined by statute and depends on a variety of factors. The present case involves the liability of general contractor Whitaker's surety, F&D, to a subcontractor, FitzGerald. Subsection 9:4813(E) states that "[t]he surety's liability . . . is extinguished as to all persons who fail to institute an action asserting their claims or rights against the owner, the contractor, or the surety within one year after the expiration of the time specified in R.S. 9:4822 for claimants to file their statement of claim or privilege." § 9:4813(E). Timely institution of an action preserves the claim.

The first question is whether FitzGerald's filing of the involuntary petition for Whitaker's bankruptcy constitutes an action asserting its claim against F&D under subsection 9:4813(E). If it does constitute such an action, FitzGerald

timely instituted its action and both of its claims are preserved.[2]  If it does not, FitzGerald's claim in the Biomedical matter is perempted.  To decide whether the FitzGerald's Lifeshare claim is perempted as well, we must determine if the time period specified in section 9:4822 expired, or for that matter began to run.  Under subsection 9:4813(E), if the period specified in section 9:4822 never ended, the one year period never ran and FitzGerald's July 2003 adversary proceeding in the Lifeshare matter was timely and its claim preserved.

B. The Involuntary Bankruptcy Petition

First, this Court must decide whether FitzGerald's participation in the August 9, 2002 involuntary bankruptcy petition against Whitaker preserved its claims against peremption under subsection 9:4813(E).  That provision extinguishes the surety's liability to those who fail to "institute an action asserting their claims or rights" within a year after the period determined by § 9:4822.  § 9:4813(E).  Although the appropriate length of the peremption period for the Lifeshare project is disputed, the parties agree that, if the period did in fact run, the involuntary bankruptcy petition was timely in both matters.

_____

[2] Because no certificate of completion was filed for the Lifeshare Project, there is controversy as to the appropriate length, and for that matter the existence, of the peremption period in the Lifeshare matter.  This is discussed in Section C, *infra*.  However, because both parties agree that both claims would be preserved if we answer the first question in the affirmative, that is where we begin.

9

The question is whether the petition constituted an "action asserting [its] rights and claims" under § 9:4813(E).[3]

The involuntary bankruptcy petition identified Whitaker as debtor, its business and the amount it owed FitzGerald: $586,258.17, including liened amounts of $418,596.58 and un-liened amounts of $167,661.59. It did not mention the PWA or specify claims made under the Act. In both the Biomedical and Lifeshare matters, the bankruptcy court determined that this constituted an assertion of FitzGerald's claim or right. The district court in the Biomedical matter disagreed, determining that the involuntary bankruptcy petition did not provide notice sufficient to preserve FitzGerald's rights under the PWA.[4] It

---

[3] The parties do not dispute that a claim valid for PWA purposes and made against general contractor Whitaker will also count against surety F&D. Under subsection 9:4813(E), a person must assert their claims or rights "against the owner, the contractor, or the surety." As the Louisiana Third Circuit Court of Appeal held in *Hershell Corp. v. Fireman's Fund Insurance Co.*, 743 So. 2d 698, 701(La. Ct. App. 1999), "suit against the contractor, owner **or** surety preserves the claim. It is a matter of preservation of the claim or privilege, not of interruption or suspension of the time period for preserving the claim or privilege" (emphasis in the original).

[4] It also determined in dicta that, unlike prescription, under Louisiana law peremption could not be renounced, interrupted or suspended. Peremption and prescription are separate concepts under Louisiana law. In *Metropolitan Erection Co., v. Landis Construction Co.*, 627 So. 2d 144 (La. 1993), the Louisiana Supreme Court explained the distinction:

> A peremptive period is a period of time fixed by law for the existence of a right, and the right is extinguished unless timely exercised within the period. LA.CIV.CODE art. 3458. On the other hand, liberative

10

found that "general allegations regarding amounts due and payable, as found in the involuntary petition relied upon by FitzGerald, without any identifying language, do not provide notice sufficient to preserve FitzGerald's rights under the LPWA." *Fid. & Deposit Co. v. FitzGerald Contractors, Inc.*, No. 03-1757 (W.D. La. May 26, 2004).[5]

### 1. The Petition did not Provide Sufficient Notice

Although prescription and peremption are distinct concepts, at oral argument both parties agreed that the peremption period at issue should be treated as a prescriptive period for purposes of preserving the claim. Therefore, we treat it as such while declining to adopt affirmatively their interpretation of Louisiana law.

---

prescription is a mode of barring actions to enforce a legal right as a result of inaction for a period of time. LA.CIV.CODE art. 3447. The right is not extinguished when the prescriptive period expires without the filing of an action; enforcement of the right is merely barred unless the obligee fails to object or unless prescription was interrupted or suspended. Peremption, by contrast, may not be interrupted or suspended.

*Id.* at 147. The *Metro Erection* court continued on to describe the time period in subsection § 9:4813(E) as peremptive: "a right against a surety under LA.REV.STAT. 9:4813(E) involves a period of peremption and becomes extinguished if not asserted within the period of limitation, which cannot be suspended or interrupted." *Id.* at 148. For reasons explained below, in the present case we treat peremption like prescription.

[5] The Lifeshare court did not address the issue, choosing instead to affirm the bankruptcy court on alternative grounds discussed in Section C, *infra*.

11

Prescription is interrupted under Louisiana law "when the obligee commences action against the obligor, in a court of competent jurisdiction and venue."  LA. CIV. CODE ANN. art 3462; see *Hensgens v. Deere & Co.*, 869 F.2d 879, 881 (5th Cir. 1989). Louisiana courts have interpreted the meaning of "commenc[ing] action" for purposes of interrupting prescription.  Determining that a workmen's compensation suit filed on behalf of a plaintiff who died in an unrelated accident prior to filing interrupted prescription, the Louisiana Supreme Court said that "the essence of interruption of prescription by suit has been notice to the defendant of the legal proceedings based on the claim involved." *Nini v. Sanford Bros., Inc.*, 276 So. 2d 262, 264-65 (La. 1973). As we have recognized, the Court in *Nini* adopted a broad view of when prescription could be interrupted.

> [T]he Court in *Nini* has, to all appearances, rejected this narrower view.  There *National Surety* was not treated as a narrow exception carved out of the general rule but as illustrative of the general rule itself. It is notice not of the plaintiff's intention to assert his demand, but of any demand stemming from the same tortious occurrence or conduct, which interrupts prescription as to subsequent demands on that "cause of action," at least to the extent that the first demand sufficiently implies the second.

*Louviere v. Shell Oil Co.*, 509 F.2d 278, 287 n.9 (5th Cir. 1975)(reversing dismissal and concluding that "suit by the employer's subrogated insurer to recover benefits paid an injured employee under the Longshoremen's and Harbor Workers'

12

Compensation Act will interrupt prescription to permit a subsequent suit by the employee for his damages arising out of the same occurrence").

The *Nini* standard allows flawed or misdirected filings to interrupt prescription. In *Batson v. Cherokee Beach and Campgrounds, Inc.*, 530 So. 2d 1128, 1130 (La. 1988), where plaintiff had brought a second tort suit after the first one's dismissal for failure to state a cause of action, the court determined that "prescription will be interrupted whether or not the original pleading sets forth a cause of action." In *Parker v. Southern American Insurance Co.*, 590 So. 2d 55 (La. 1991), the plaintiff had filed a compensation suit for her husband's death against his employer and later filed a tort action against that employer's insurer. In that case, the former suit interrupted the prescription period for the latter because a "pleading which alleges a factual occurrence and liability of a named defendant interrupts prescription despite failure to state a cause of action by alleging negligence." *Id*. at 56. As the Louisiana Supreme Court explained,

> The fundamental purpose of prescription statutes is only to afford a defendant economic and psychological security if no claim is made timely, and to protect him from stale claims and from the loss of non-preservation of relevant proof. They are designed to protect him against lack of notification of a formal claim within the prescriptive period, not against pleading mistakes that his opponent makes in filing the formal claim within the period.

13

*Giroir v. S. La. Med. Ctr., Etc.*, 475 So.2d 1040, 1045 (La. 1985)(reversing judgment of court of appeals and determining that amendments changing capacity of suing husband and adding children as wrongful death plaintiffs successfully related back).

This Court has applied *Nini* to allow certain legal actions which are not lawsuits to interrupt prescription. In *McGee v. O'Connor*, 153 F.3d 258 (5th Cir. 1998), we held that filing of proofs of claim in a bankruptcy interrupts prescription of contract claims under Louisiana law. Drawing an analogy between proofs of claim in bankruptcy proceedings and those in succession proceedings–which under the relevant Louisiana statute suspend prescription–we said that the "key to *Parker* is that the defendant there received *notice*."[6] *Id*. at 262 (emphasis in the original). As a result, worker's compensation claims will interrupt the running of prescription for tort claims against third parties. *See Drury v. U.S. Army Corps of Eng'rs.*, 359 F.3d 366, 368 (5th Cir. 2004).

*Nini* is, of course, not without its limits. Certain federal administrative actions will not interrupt prescription of state

---

[6] Prescription is interrupted when the prescriptive period restarts; it is suspended when the period stops to run for an applicable time. *Rogers v. Corrosion Prods., Inc.*, 42 F.3d 292, 293 (5th Cir. 1995). The distinction between the two is irrelevant for present purposes, as the question is whether the involuntary bankruptcy petition preserved the claim. The quantum of legal notice does not determine whether a prescriptive period is suspended or interrupted.

law claims. In *Drury*, we determined that a suit under the Federal Tort Claims Act did not interrupt prescription for a state tort suit. *Drury*, 359 F.3d at 368-69. Likewise, in *Fitzgerald v. United States Department of Veterans Affairs*, we noted that no authority supported the proposition that filing an administrative Title VII complaint would interrupt prescription of state law discrimination claims. 121 F.3d 203, 210 (5th Cir. 1997). The lynchpin, again, is notice to the defendant.

FitzGerald argues that the involuntary bankruptcy petition gave sufficient notice of its claim to Whitaker to preserve its claim, and that this Court should extend *Nini* to the present case. It emphasizes that the $586,258.17 amount claimed included the $82,473.89 amount that was the subject of the Biomedical proceedings and the $81.689.00 amount that was the subject of the Lifeshare proceedings.

We disagree. The involuntary bankruptcy petition did not provide sufficient notice to prevent peremption and preserve the claim. The amounts owed under the PWA are indistinguishable in the involuntary bankruptcy petition from Whitaker's traditional contractual obligations to FitzGerald.

While both the contractual and PWA obligations stem from the same set of events, in cases reliant on *Nini*, more information was available than is here. In *O'Connor*, the proofs of claim were for the debtor's obligation. 153 F.3d at 262. We

15

specifically distinguished that case from one in which a proof of claim for the proceeds of an auction house's bankruptcy did not interrupt prescription in a tortious conversion suit against its former employee. *Id.* at 262 n.5 (citing *Hilbun v. Goldberg*, 823 F.2d 881 (5th Cir. 1987)). Here, the petition is against Whitaker, not its surety. More importantly, the legal and factual bases for the debt are not identified. In *Parker* and *Nini*, the factual and legal bases of liability were spelled-out. 590 So.2d at 56; 276 So.2d at 266. The involuntary bankruptcy petition includes no references to the PWA, nor to the Biomedical Project, the Lifeshare Project or any other private work. It indicates merely the creditor and the amount owed.

*O'Connor* does not identify precisely the quantum of description that constitutes proper notice; but we believe the line falls beyond the reach of this involuntary bankruptcy petition. In *Abramson v. Boedeker*, we noted that an involuntary bankruptcy petition "serves as even less notice than the generalized complaint. . . .The 'right' of a creditor to hang on to his self-help priority may not, therefore, be equated with concepts of fair notice from pleadings." 379 F.2d 741, 745 n.7 (5th Cir. 1967)(evaluating such a petition in the context of determining whether it or an amended complaint established the date of bankruptcy). More substantial notice is required to preserve a PWA claim.

16

This conclusion is bolstered by the instruction of the Louisiana Supreme Court in *Metro Erection*, that PWA rights were "in derogation of common rights and must be strictly construed against those to whom the right is accorded." *Metro Erection*, 627 So. 2d at 148.

### 2. The Petition was not an Informal Proof of Claim

Alternatively, FitzGerald argues that the involuntary bankruptcy petition qualifies as an informal proof of claim, and that *O'Connor* requires the claim be preserved. F&D responds that the doctrine of informal proof of claim does not apply, both because the doctrine is an equitable one and because FitzGerald timely filed. In *In re Nikoloutsos*, 199 F.3d 233 (5th Cir. 2000), we adopted a five-part test for qualifying something as an informal proof of claim:

> (1) [T]he claim must be in writing; (2) the writing must contain a demand by the creditor on the debtor's estate; (3) the writing must evidence an intent to hold the debtor liable for such debt; (4) the writing must be filed with the bankruptcy court; and (5) based upon the facts of the case, allowance of the claim must be equitable under the circumstances.

*Id*. at 236. The parties do not dispute that the first four conditions have been met in the present case.

In *Nikoloutsos*, the claimant, a woman seeking to enforce a judgment against her husband for maliciously assaulting her, filed her complaint late. Orally, the bankruptcy court seemed willing to accept the complaint as a proof of claim; but later,

17

without explanation, it did not recognize it as such. This Court noted that "the rules of equity require being flexible with regard to form when justice requires." *Id*. at 237 (punctuation omitted). Our other applications of the informal proof of claim doctrine have rectified similar injustices but not mere mistakes in advocacy. *See, e.g.*, *Greyhound Lines, Inc. v. Rogers*, 62 F.3d 730 (5th Cir. 1995) (regarding an informal proof of claim where claimant failed to file because of concomitant court-ordered alternative dispute resolution program); *cf. DeCell &. Assocs. v. FDIC,* 36 F.3d 464 (5th Cir. 1994) (holding there was no informal proof of claim where assignee of letter of credit sued FDIC in its corporate capacity but not in its receivership capacity and failed to make a deposit insurance claim). FitzGerald was represented by counsel and had the opportunity to raise its claim under the PWA. It chose to file only the petition for involuntary bankruptcy within the peremption period. Equity does not support application of the doctrine in this instance. Even if this Court were to consider the present involuntary bankruptcy petition an informal claim, for *O'Connor* to apply, FitzGerald would still have had to provide sufficient notice. It did not, so the district court's judgment is affirmed.

### 3. <u>Resolution of the Biomedical Matter</u>

A certificate of substantial completion was filed for the

Biomedical project on September 17, 2001.  The section 9:4822 period elapsed thirty days later, and the section 9:4813 period one year after that.  Thus, FitzGerald had until October 17, 2002 to institute an action asserting its claim.  The only action it undertook before that deadline was joining the involuntary bankruptcy petition against Whitaker on August 9, 2002.  Because that action did not constitute an "action asserting [its] rights and claims" under § 9:4813(E), FitzGerald's claim in the Biomedical matter is perempted.

C. <u>Triggering of the Peremptive Period</u>

Because we hold that the involuntary bankruptcy petition could not preserve FitzGerald's claim, this Court must decide a second question regarding the Lifeshare matter: whether, when notice of a contract has been filed but notice of termination has not, the one-year extinguishment period in subsection 9:4813(E) is triggered; and, if so, when.  Section 9:4822 provides, in pertinent part:

> A.  If a notice of a contract is properly and timely filed in the manner provided by R.S. 9:4811, the persons to whom a claim or privilege is granted by R.S. 9:4802 shall within thirty days after the filing of a notice of termination of the work:
>
> (1) File a statement of their claims or privilege.
> (2) Deliver to the owner a copy of the statement of claim or privilege.
>
> . . .
>
> C.  Those persons granted a claim and privilege by R.S. 9:4802 for work arising out of a general contract, notice of which is not filed, and other persons granted a privilege

19

under R.S. 9:4801 or a claim and privilege under R.S. 9:4802 shall file a statement of their respective claims and privileged within sixty days after:

(1) The filing of a notice of termination of the work; or
(2) The substantial completion or abandonment of the work; if a notice of termination is not filed.

LA. REV. STAT. ANN. § 9:4822(A), (C).[7]  In the Lifeshare matter, while the construction contract was properly and timely recorded on July 25, 2000, no notice of termination was ever filed. Still, other evidence suggests the project was completed: on June 29, 2001, the Estopinal Group, architect for the Lifeshare Project, compiled a punchlist; minutes of the project's progress meetings indicate it was ready to be occupied between July 23 and 26; and, on July 25, the City of Shreveport issued a certificate of occupancy.

The courts below, as well as the parties, differ on the application of section 9:4822 to these facts.  Ruling from the bench, the bankruptcy court determined that the specified period began to run sixty days after the issuance of the certificate of occupancy.[8] *Whitaker Constr. Co. v. FitzGerald Contractors, Inc.* (In re *Whitaker Constr. Co.*), No. 02-12642 (Bankr. W.D. La. Mar.

---

[7] LA. REV. STAT. ANN. § 9:4802(A)(1) grants subcontractors like FitzGerald claims for the price of their work.

[8] Because it determined that FitzGerald's filing of the involuntary bankruptcy petition was a timely assertion of rights, the bankruptcy court determined that the claims were preserved.

26, 2004).  The district court disagreed, holding that "because a notice of contract was filed but a notice of termination or certificate of substantial completion was not filed, the 30-day tolling period never began to run." *Fid. & Deposit Co. of Maryland v. FitzGerald Contractors, Inc.*, No. 03-1757 c/w No. 04-0913 (W.D. La. Dec. 10, 2004).  F&D argues that subsection 9:4822(C) applies when no notice of termination is filed, and that the peremptive period began to run sixty days after issuance of the certificate of occupancy.[9]  FitzGerald contends that subsection 9:4822(A) governs all situations in which notice of the contract has been filed, and that its thirty day period does not begin to run until filing of a notice of termination.  If the peremption period never began to run, FitzGerald's July 17, 2003 adversary complaint was timely.  If it did run, the only timely filing was the involuntary bankruptcy petition, which does not suffice to preserve the claim for the reasons discussed in Section B, *supra*.

      1.   <u>The Text of the Statute</u>

---

[9] F&D identifies the issuance of the certificate of occupancy as the point of substantial completion in accordance with § 9:4822(H), which reads: "A work is substantially complete when: (1) The last work is performed on, or materials are delivered to the site of the immovable or to that portion or area with respect to which a notice of termination is filed; or (2) The owner accepts the improvement, possesses or occupies the immovable, or that portion or area of the immovable with respect to which a notice of partial termination is filed, although minor or inconsequential matters remain to be finished or minor defects or errors in the work are to be remedied."

In interpreting a Louisiana statute, this Court must be mindful of the state's hybrid civil/common law tradition. In the civil law tradition, the Civil Code is the "solemn expression of legislative will" to which our *Erie* obligation applies. *Songbyrd, Inc. v. Bearsville Records, Inc.,* 104 F.3d 773, 776 (5th Cir. 1997) (quoting *Shelp v. National Surety Corp.*, 333 F.2d 431, 439 (5th Cir. 1964)); *see also Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). We look to the statute as the primary source of law. *In re Orso*, 283 F.3d 686, 695 (5th Cir. 2002). If the statute is unambiguous, our inquiry ends, and we need go no further. *Id.* at 693. If it is ambiguous, we consult other sources of authority.

FitzGerald and the district court contend that the language of section 9:4822 supports the reading that subsection (A) applies to situations in which notice of a contract has been filed and subsection (C) to situations in which it has not. Subsection 9:4822(A) begins "[i]f a notice of a contract is properly and timely filed in the manner provided by R.S. 9:4811, . . . ." The use of the word "if" before a comma implies a sufficient condition for whatever follows the comma. Here, the condition is proper and timely filing of the notice of contract. On this reading of section 9:4822, when this condition is fulfilled, i.e., when notice of the contract is filed, subsection (A) applies.

Taken together, the prefatory clauses of the two subsections also support this reading. While (A) begins with a properly filed notice of contract, subsection (C) begins "[t]hose persons granted a claim and privilege by R.S. 9:4802 for work arising out of a general contract, notice of which is not filed . . ." § 9:4822(C). The language here does not imply a sufficient condition. Like the one immediately preceding it,[10] subsection (C) begins by defining the group of people to whom it applies. Since subsection (C) applies to those granted a claim for work arising out of a contract that is not filed, it applies when the contract is not filed. If each subsection is understood to apply exclusively to when a notice of contract has been filed and when it has not, subsection (A) should govern the present situation and the peremptive period in subsection 9:4813(E) is not triggered.

The bankruptcy court and F&D read section 9:4822 differently, limiting subsection (A) to those situations where both a notice of a contract and a notice of termination have been filed. Under their reading, subsection (C) operates as a catch-all category for all other situations. They offer two arguments to support this reading. First, the wording of subsection (A) does not provide explicitly for a situation in which notice of the contract has been filed but notice of termination has not.

---

[10] LA. REV. STAT. ANN. § 9:4822(B) begins "[a] general contractor to whom a privilege is granted by R.S. 9:4801."

23

It provides that when a contract has been filed, the person granted rights must file and deliver a statement within thirty days of filing of the notice of termination.  As the argument goes, because the subsection assumes the filing of the notice of termination, it cannot apply when that notice is not filed.

Second, other language in subsection (C) can be read as applying where notice of the contract has been filed but notice of termination has not.  After identifying § 9:4802 claimants who work on contracts the notice of which is not filed, subsection (C) continues "*and* other persons granted a privilege under R.S. 9:4801 or a claim and privilege under R.S. 9:4802 . . . ."  § 9:4822(C) (emphasis added).[11]  The use of the conjunctive "and"

---

[11] Section 9:4802 reads, in pertinent part:
    A.  The following persons have a claim against the owner and a claim against the contractor to secure payment of the following obligations arising out of the performance of work under the contract:
        (1) Subcontractors, for the price of their work.
        (2) Laborers or employees of the contractor or a subcontractor, for the price of work performed at the site of the immovable.
        (3) Sellers, for the price of movables sold to the contractor, or a subcontractor that become component parts of the immovable, or are consumed at the site of the immovable, or are consumed in machinery or equipment used at the site of the immovable.
        (4) Lessors, for the rent of movables used at the site of the immovable and leased to the contractor or a subcontractor by written contract.
        (5) Prime consultant registered or certified surveyors or engineers, or licensed architects, or their professional subconsultants, employed by the contractor or a subcontractor, for the price of professional services rendered in connection with a work that is undertaken by the contractor or subcontractor. . . .

24

and the words "other persons" suggests a different group than that identified in the initial clause of the subsection, in other words a group of people granted a claim or privilege on a contract notice of which *is* filed.  The "notice of which is not filed" clause lies immediately after the first clause, suggesting it does not apply to the "other persons" mentioned later.

F&D argues that the words "other persons" in subsection (C) include those in FitzGerald's position.  Certainly, "other persons" refers to those granted privileges under section 9:4801 other than general contractors, since subsection § 9:4822(B) provides a separate rule for general contractors.  But "other persons" also includes a group of people with a claim and privilege under section 9:4802.  F&D argues that this latter group includes all section 9:4802 claimants other than those in the situation to which, it claims, subsection 9:4822(A) applies exclusively--where notice of the contract and notice of termination have both been filed.

FitzGerald asserts that the "other persons" under section 9:4802 can be understood in contrast to the earlier mention of section 9:4802 claimants in the subsection.  The earlier mention reads "persons granted a claim and privilege by R.S. 9:4802 for work arising out of a general contract," whereas the "other persons" includes those with "a claim and privilege under R.S.

---

LA. REV. STAT. ANN. § 9:4802.

25

9:4802." § 9:4822(C). The difference between the two is the "work" in which the former group participates. Section 9:4802 lists categories of construction participants and the sources of their claims. Subcontractors have a claim "for the price of their work," and laborers or employees "for the price of work performed." § 9:4802(A)(1), (2). Sellers', lessors' and professionals' claims are grounded not on work but on the price or rent of the goods and services they provide. § 9:4802(A)(3)-(5). FitzGerald argues that, since these last three categories have claims that are not "for *work* arising out of a general contract," they are the "other persons" contemplated by subsection (C).

We are not persuaded by FitzGerald's artful textual construction of "other persons." Subsection 9:4802(A)'s preface to all five categories reads as follows: "[t]he following persons have a claim . . . to secure payment of the following obligations arising out of the performance of work under the contract." The prefatory clause in subsection 9:4822(C) maps this language closely, suggesting that all five categories are contemplated. Ultimately, ambiguity remains as to the identity of section 9:4822(C)'s "other persons."

Ambiguity exists in the statute, so we must look to authority beyond the text.

> 2. <u>Caselaw and Commentary</u>

To resolve textual ambiguity, we consult the interpretations given to the statute by Louisiana courts. *Jesco Const. Corp. v. NationsBank Corp.*, 278 F.3d 444, 447 (5th Cir. 2001). In looking at caselaw, we "steer clear of the common law principle of *stare decisis* and . . . apply instead the distinctly Civilian doctrine of *jurisprudence constante*."[12] *Songbyrd*, 104 F.3d at 776. The decisions of Louisiana courts do not so much establish a rule we are bound to follow as interpretations invaluable to our understanding. *Id*. at 777; *Orso*, 283 F.3d at 695. Because the Louisiana Supreme Court has not addressed whether the peremption period begins to run when notice of the contract has been filed but notice of termination has not, we make an "*Erie* guess" as to what its answer would be. *Rogers*, 42 F.3d at 295.[13] In examining

---

[12] Black's Law Dictionary defines *jurisprudence constante* as "[t]he doctrine that a court should give great weight to a rule of law that is accepted and applied in a long line of cases, and should not overrule or modify its own decisions unless clear error is show and injustice will arise from continuation of a particular rule of law." *Black's Law Dictionary* 872 (8th ed. 2004). This principle is distinct from *stare decisis* in that it "does not command strict adherence to a legal principle applied on one occasion in the past." *Id*.

[13] The bankruptcy stay alleged to stop the running of prescription in *Rogers* came about through the filing of an involuntary bankruptcy petition, and this Court examined whether the stay suspended prescription under Louisiana law. *Rogers*, 42 F.3d at 293, 295 (affirming district court determination that bankruptcy stay did not stop running of prescriptive period for delictual actions). However, that case is inapplicable here. In *Rogers*, we asked whether the equitable doctrine of *contra non valentem agere non currit praescripto*, a judicial creation that suspends prescription for a limited category of plaintiffs unable

27

the opinions of lower courts, we are mindful that "'an intermediate appellate state court . . . is datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id*. (quoting *Comm'r. v. Estate of Borsch*, 387 U.S. 456, 465 (1967).

In the situation at hand, lower Louisiana courts reach the conclusion that the peremption period does not trigger. In *Bernard Lumber Co., Inc. v. Lake Forest Constr. Co.*, the Louisiana First Circuit Court of Appeal examined section 9:4822 and held:

> The terms of the statute clearly establish that La.R.S. 9:4822(A) governs those situations in which a notice of contract has been filed, and La.R.S. 9:4822(C) governs those situations in which no notice of contract has been filed. Therefore, where an owner has neglected to file a notice of termination, the 30-day period provided for in La.R.S. 9:4822(A) never begins to run.

572 So. 2d 178, 181 (La. Ct. App. 1990). *Bernard Lumber* involved a subcontractor who sued the general contractor and the owner to recover for services and material supplied for the renovation of a restaurant. The court considered the legislative intent behind the Private Works Act, protecting materialmen, laborers and subcontractors, and determined that the legislature intended to

---

to bring suit, applied to the plaintiff. *Id*. at 294. The issue there was whether a stay resulting from an involuntary bankruptcy petition excused plaintiff's failure to file. Here the question is whether the petition itself is a filing at all.

28

place the onus for filing on the owner. "Where the owner fails or neglects to take such affirmative action," the court wrote, "he should be made to bear the consequences of his failure to file a notice of termination, not the claimant." *Id*. Likewise, although it reviewed an earlier version of section 9:4822, the *Rowley Co. v. Southbend Contractors, Inc.* court determined that the thirty-day period would not run without proper filing on the part of the owner. 517 So. 2d 1260 (La. Ct. App. 1987). In *Rowley*, a subcontractor sued the general contractor and its surety to recover labor costs. The Louisiana Fourth Circuit Court of Appeal determined that the notice of termination's pithy description—of the address of the project—was insufficient. *Id*. at 1261. While the court was primarily concerned with a different issue, its conclusion is consistent with the court in *Bernard Lumber*: the thirty-day period will not begin to run until the owner acts.

F&D argues that both *Bernard Lumber* and *Rowley* are inapplicable. It points to the fact that *Bernard Lumber* did not involve a suit against a surety; but this distinction is irrelevant as applied to section 9:4813. That provision, which creates the surety's liability, explicitly refers to section 9:4822, which the First Circuit interpreted in *Bernard Lumber*. Moreover, subsection (E) says that claims must be asserted against "the owner, the contractor, *or* the surety" §

29

9:4813(E)(emphasis added). Whether the defendant is the owner or the surety is irrelevant for purposes of the claim itself, and a case determining the time limit for a suit against an owner applies as well to a suit against a surety. F&D attempts to distinguish *Rowley* because that case dealt with the requirements for a valid notice of termination. But, again, the primary holding of *Rowley* is not relevant; the result reached by the court is: that the time period would not begin to run without a proper notice of termination. *Rowley* supports the proposition that the time period will not commence without affirmative action on the part of the owner.

The reading given section 9:4822 by Louisiana courts is bolstered by language in the official comments to section 9:4822. This language suggests that subsection (A), not subsection (C), applies to the present situation. "If a notice of contract is filed," the commentary reads, "a notice of termination is always required to commence the 30 day time for filing. Where no notice of contract is filed the owner may still file a notice of termination." § 9:4822 cmt. (a). If a notice of contract is filed but the notice of termination is not, the comments suggest that the thirty day period simply does not commence.

Finally, F&D argues that construing subsection 9:822(A) to mean the time period never triggered would create an "open-ended lien period" inconsistent with the general structure and policy

underlying the PWA. First, it contends the Act is a "unified scheme," and that all situations should fit snugly into the thirty-sixty day structure articulated in section 9:4822. According to this account, the broad language in subsection 9:4822(C) includes all situations other than that one explicitly outlined in subsection 9:4822(A), when notice of the contract and notice of termination have both been filed. This interpretation does not follow directly from the statutory language, and it is inconsistent with all of the aforementioned sources. F&D also asserts that the PWA seeks to balance new rights created in laborers, contractors and the like with the liability concerns of sureties. It points to strong peremption language in § 9:4813(E). This may well be true; but it is not our prerogative to dictate to the Louisiana legislature where to strike the balance between the rights of sureties and construction creditors.

A plain reading of subsection 9:4822(A), extant caselaw and official commentary all bolster our understanding of section 9:4822, that when notice of a contract has been filed but notice of termination is not, the time period for making claims is not triggered. Accordingly, we affirm the district court's determination that the peremptive period was not triggered. Because the period was not triggered, FitzGerald's adversary action in July 2003 was timely under the PWA; and its claim in the Lifeshare matter is not perempted.

## V. Conclusion

For the reasons above, we affirm the judgment of the district court.

AFFIRMED.